IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

v.

PATRICIA FOUNTAIN,

　　　　　　　　　　Defendant.

CRIMINAL NO. 12-155

**Slomsky, J.**　　　　　　　　　　　　　　　　　　**November 7, 2024**

**I.   INTRODUCTION** ........................................................................................................... 3

**II.   BACKGROUND** ........................................................................................................... 4

　A.   Defendant's Criminal History ..................................................................................... 4

　B.   Procedural History ....................................................................................................... 5

　C.   Defendant's Present Motion for Compassionate Release ........................................... 5

　D.   Government's Response in Opposition to Defendant's Motion ................................... 8

**III.   ANALYSIS** ................................................................................................................. 10

　A.   The Analytical Framework Regarding Motions for Compassionate
　　　Release Pursuant to 18 U.S.C. §3582(c) ................................................................. 10

　B.   Defendant's Motion for Compassionate Release Will Be Denied ............................ 15

　　　1.   Defendant's Family Circumstances Do Not Present Extraordinary
　　　　　and Compelling Reasons for Her Release. ........................................................ 16

1

2.   Defendant's Medical Conditions Do Not Present Extraordinary and Compelling Reasons for Her Release ............................................... 16

3.   Defendant's Claim of Abuse Lacks Sufficient Evidence to Establish an Extraordinary or Compelling Reason................................................ 19

4.   Defendant's FSA Credit Calculation Does Not Warrant Release ........................... 20

5.   There Has Been No Change in Law Warranting Defendant's Release................... 20

C.   The § 3553(a) Sentencing Factors Weigh Against Defendant's Release ............................24

IV.   CONCLUSION ............................................................................................. 26

## I.       INTRODUCTION

Before the Court is Defendant Patricia Fountain's Third Motion for Compassionate Release pursuant to 18 U.S.C. 3582(c)(1)(A)(i).  (Doc. No. 344.)  In this Motion, she argues that the Court should grant her Compassionate Release for seventeen (17) reasons, which she contends are "extraordinary and compelling."  (Id. at 1.)  They include the following:  (1) the death of her youngest son in July 2020; (2) her completion of over 50% of her sentence; (3) the sentencing Judge, Stewart Dalzell, had Alzheimer's disease "before, during, and after [her] trial"; (4) her completion of over ten years of programing and apprenticeship, which shows her rehabilitation; (5) the non-treatment of her illnesses, including Adrenoleukodystrophy; (6) the impacts of the Covid-19 pandemic; (7) her eldest son's need for a bone marrow transplant; (8) the sentencing disparity between her and her co-defendants, uncharged co-defendants, and other similarly situated individuals; (9) the Hobbs Act's extortion definition being clarified, and no longer applying to her; (10) she is a first-time, non-violent white collar offender who has the "lowest possible risk for recidivism"; (11) the Bureau of Prisons ("BOP") will save over $40,000 per year by releasing her; (12) her family's history of cancer, and the inability to seek a second opinion for a lump that was found on her body; (13) her prison being over 500 miles away from her release address; (14) the lack of treatment for her chronic medical problems; (15) previous abuse by a BOP staff member; (16) incorrect application of First Step Act credits towards release on probation; and (17) poor prison conditions.  (Id. at 1-4.)  Defendant contends these reasons warrant reducing her sentence to time served under 18 U.S.C. § 3582(c)(1)(a)(i).  (Id. at 1.)

The Government opposes this Motion because it is essentially based on the same grounds as her previous Motion for Compassionate Release, which this Court denied on August 29, 2023.[1] On October 18, 2024, Defendant filed a Reply proffering similar arguments in her Motion.  (Doc. No. 351.)

For the reasons that follow, Defendant's Third Motion for Compassionate Release (Doc. No. 344) will be denied.

## II.      BACKGROUND

### A.  Defendant's Criminal History

Defendant is presently incarcerated for her role "as an organizer or leader in a deliberate and long-term sophisticated scheme to defraud the United States."  (Doc. No. 293 at 14.)  From 2007 to 2012, Defendant, then an Internal Revenue Service ("IRS") employee, defrauded the United States of over $2.2 million with assistance from her husband, a co-defendant.  (Id. at 1.)

In March 2013, a jury found Defendant guilty of "conspiracy to defraud the United States, filing false claims, and Hobbs Act extortion."  (Id.)  In June 2013, Defendant was sentenced to 228 months in prison.  (Id.)  She has served over 60 percent of her sentence.  (Doc. No. 344 at 10.) Defendant served approximately 51 percent of her sentence at Alderson Federal Prison Camp ("FPC").  (Doc. No. 335 at 3.)  On March 22, 2023, Defendant was transferred to a United States Federal Transfer Center in Oklahoma City, Oklahoma, but is currently being held at Danbury Federal Correctional Institution ("FCI") in Danbury, Connecticut.  (Doc. No. 326 at 1.)

---

[1]  On September 7, 2023, Defendant filed an appeal of this Court's denial of her Motion for Compassionate Release.  See United States v. Fountain, No. 23-2675 (3d Cir. Jan. 30, 2024). The Third Circuit summarily affirmed the ruling of this Court.  Id.

### B.  Procedural History

On June 22, 2020, Defendant submitted a request for Compassionate Release to the Warden at Alderson FCP, which was denied.  (Doc. No. 293 at 3.)  On August 18, 2020, Defendant filed a letter with this Court, concerning Alderson FPC's conditions, her health conditions, and concluding with a request for release.  (Doc. No. 292 at 1-2.)  This Court considered the letter Defendant's First Motion for Compassionate Release pursuant to 18 U.S.C. §3582(c)(1)(A)(i).  (Doc. No. 303 at 3.)  The Motion was denied on January 26, 202.  (Id. at 15.)

On October 13, 2021, Defendant filed an appeal.  See United States v. Fountain, No. 21-1212 (3d Cir. Oct. 13, 2021).  The Court of Appeals for the Third Circuit affirmed this Court's ruling denying her compassionate release.  Id.

On October 31, 2022, Defendant filed a Second Motion for Compassionate Release pursuant to 18 U.S.C. §3582(c)(1)(A)(i).  (Doc. No. 319 at 1.)  The Motion, and its amendments, provided thirteen (13) reasons for compassionate release.  (Id.)  The documents focused on Defendant's medical conditions, the prison conditions at Alderson FPC, this Court's alleged wrongful application of sentencing principles, and a proposed amendment to the United States Sentencing Guidelines which, if adopted, would cause the Hobbs Act not to apply to her convictions.  (Doc. No. 335 at 5.)  On August 29, 2023, the Motion was denied.  (Doc. No. 335.)

As noted, on September 7, 2023, Defendant filed an appeal.  (Doc. No. 23-2675.)  The Court of Appeals affirmed this Court's ruling denying her compassionate release.  (Id.)

### C.  Defendant's Present Motion for Compassionate Release

On October 5, 2023, Defendant submitted another request for Compassionate Release to the Warden at Danbury FCI, which was denied on December 5, 2023.  (Doc. No. 344 at 1-3.)  On August 21, 2024, Defendant filed a letter with this Court, requesting Compassionate Release

pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  (<u>Id.</u> at 4.)  In the Motion, Defendant alleges seventeen (17) reasons for compassionate release, which are set forth above.  Defendant, for the third time, stresses her medical conditions and how they would be affected by COVID-19.  (<u>Id.</u> at 5-6.) Defendant claims to have various conditions that place her at a heightened risk of severe illness or death from COVID-19, including vertigo, hypertension, adjustment disorder with anxiety, psychosocial and environmental problems, adrenoleukodystrophy ("ALD"), obesity, bilateral neuropathy, post-traumatic stress disorder ("PTSD"), severe depression, multiple sclerosis ("MS"), arthropathy, and idiopathic peripheral automatic neuropathy.  (<u>Id.</u>)  Defendant also claims to have nerve damage in her left eye with declining sight in both eyes.  Additionally, Defendant avers that "cancer runs in [her] family" and she needs to see a specialist to get a second opinion on a lump found on her body.  (<u>Id.</u> at 1.)

Defendant also argues the First Step Act, and her earned time credits, make her eligible for immediate release.  (<u>Id.</u> at 8-10.)  Defendant claims to have 365 days of earned time credit, 365 days of credit towards a halfway home placement, and 180 days of credit due to the Home Confinement Second Chance Act.  (<u>Id.</u>)  Defendant argues the BOP unlawfully refuses to place her in a halfway home, despite a legal obligation to do so.  (<u>Id.</u>)

Defendant further argues that her sentence was disproportionate compared to her co-defendants, as well as other similarly situated individuals.  (<u>Id.</u> at 10.)  She cites Michael Avenatti (as well as other defendants) to showcase the disparity in sentencing between her and the referenced defendants.[2]  (<u>Id.</u>)  Further, Defendant claims a change in the Hobbs Act's extortion

---

[2] Michael Avenatti attempted to extort Nike out of between 15 million and 25 million dollars. <u>See</u> <u>United States v. Avenatti</u>, 81 F.4th 171, 186 (2d Cir. 2023).  He was convicted of (1) transmitting interstate communications with intent to extort, (2) attempted Hobbs Act extortion, and (3) honest services wire fraud. <u>See</u> <u>id.</u> at 175.  Avenatti was sentenced to 30 months in prison.  <u>See</u> <u>id.</u>

definition was clarified to only include threats of violence to persons or property.  (Id. at 14.)  As such, according to Defendant, the Hobbs Act extortion conviction should be vacated, which would lead to her immediate release from prison.  (Id.)  Finally, Defendant argues that Amendment 821 of the United States Sentencing Guidelines ("Sentencing Guidelines") applies retroactively to her own sentence because she had a zero-point Criminal History Category.  (Id. at 19.)  As such, she argues that if the amended guidelines existed "at the time of [her] sentencing, the court would have considered a lower sentencing range."  (Id. at 19.)[3]

Defendant further discusses the conditions of her prison facility and how it necessitates release.  First, she argues that the prison is dangerous because of its inability to protect against the spread of COVID-19.  (Id. at 5-6.)  This, according to Defendant, results from the number of inmates per dorm and the communal nature of the prison.  (Id. at 5.)  Defendant argues her prison does not "have the basic necessities for [her] to be housed [there]."  (Id.)  She claims the prison regularly runs out of food, is near maximum capacity, has no central air conditioning, had a water outage, is understaffed, has sewage problems, is "unfinished," and is infested with various bugs.  (Id. at 6-7.)  Defendant also claims to have been physically assaulted by a BOP staff member, which was allegedly "witnessed by [four] female guards and over 300 inmates. . . ."  (Id. at 9.)  Finally, Defendant again claims to be confined more than 500 miles from her home, despite being transferred in March 2023 to FCI Danbury, which is approximately 160 miles from Philadelphia.

Defendant provides various other reasons for why her compassionate release motion should be granted.  They include: the death of her youngest son, her oldest son's need for a bone marrow

---

[3] USSG Amend. 821 §4C1.1 allows a "decrease of the offense level determined under Chapters Two and Three by [two] levels" if a defendant meets all of the ten provided criteria.  See Section 5 below.

transplant, her trial judge's Alzheimer's disease, BOP would save $40,000 a year by placing her in a halfway house, rehabilitation, and her low risk of recidivism.  (See id. at 1-14.)

**D.  Government's Response in Opposition to Defendant's Motion**

On September 3, 2024, the Government filed a response to Defendant's Motion.  (Doc. No. 345).  In its response, the Government submits that Defendant's "latest motion largely repeats all of the same claims that this Court deemed insufficient when denying her last motion for compassionate release . . . ."  (Id. at 1 (internal citation removed)).  The Government argues that Defendant does not "present an 'extraordinary and compelling reason' allowing consideration for relief."  (Id.)  Alternatively, the 18 U.S.C. §3553(a) factors ("the §3553(a) factors") do not support early release.  (Id.)

First, the Government addresses Defendant's medical conditions.  (See id.)  It cites recent BOP medical records which, it claims, shows both no significant change in Defendant's condition and regular attention by BOP staff to Defendant's complaints.  (See id.)  The Government scrutinizes Defendant's claim of having multiple sclerosis, relying on the report of the neurologist who consulted with Defendant on May 14, 2024.  (See id. at 2.)  The Government quotes a portion of the neurologist's report that stated Defendant's symptoms are "unlikely related to an underlying demyelinating process" but they will proceed with a magnetic resonance imaging (an "MRI") of Defendant's brain.  (Id.)  Further, the Government rebuts Defendant's claim that cancer runs in her family because Defendant provided "no details supporting her claim, nor any evidence that there is any treatment or examination BOP has failed to provide."  (Id. at 3.)  For the reasons provided above, the Government argues that Defendant does not present the extraordinary medical circumstances that may warrant relief because she has not presented a terminal illness or shown that she is unable to provide self-care while incarcerated.  (See id. at 2.)  The Government also

notes that Defendant's quality of medical care "should be addressed through the BOP's established administrative process." (Id. at 3.)

Second, the Government addresses Defendant's argument regarding COVID-19 as "quite dated." (Id.)  The Government cites United States v. Stewart, 86 F. 4th 532, 536 (3d Cir. 2023), arguing that the availability of vaccinations and the ability of BOP to mitigate the harm of COVID-19 supports the conclusion that the mere existence of COVID-19 cannot, by itself, justify compassionate release.[4]  (See id. at 3-4.)  They also apply the test articulated by this Court regarding release due to COVID-19, which was previously applied to deny Defendant's prior petition.[5]  (Id.)  The Government argues Defendant "continues not to meet this test." (Id. at 5.)

Third, the Government responds to Defendant's complaints about prison conditions by stating that "[t]his situation is not unique to [Defendant], and may be addressed through administrative complaints, and if necessary, through civil litigation."  (Id.)  Fourth, the Government points out that Defendant was transferred to FCI Danbury, which is approximately 160 miles from Philadelphia, refuting Defendant's claim that she is incarcerated more than 500 miles from her home.  (See id.)

Fifth, the Government addresses Defendant's allegation of being assaulted by a BOP staff member as non-specific and "vague." (Id. at 5-6.)  It points out that there has been no adjudication of an incident, and there has been no showing of delay or danger to Defendant.  (See id. at 6.)

---

[4] In Stewart, the Third Circuit declared that "[o]ur decision in United States v. Raia makes clear that 'the mere existence of COVID-19 in society . . . cannot independently justify a compassionate release.'"  United States v. Stewart, 86 F. 4th 532, 536 (3d Cir. 2023).

[5] This Court stated: "a prisoner seeking release due to COVID-19 must at least show:  (1) a sufficiently serious medical condition, or advanced age, placing the prisoner at a uniquely high risk of grave illness or death if infected by COVID-19; and an actual, non-speculative risk of exposure to COVID-19 in the facility where the prisoner is held." ECF 335 at 13 (quoting United States v. Somerville, 463 F. Supp. 3d 585, 596-97 (W.D. Oa. 2020.)

According to the Government, Defendant's claim is "plainly not a basis for consideration" of compassionate release under guidelines allowing release for victims of abuse.  (See id.)

Sixth, regarding Hobbs Act Robbery, the Government avers there has been no change to the definition of extortion under the Hobbs Act.  (See id.)  The Government theorizes that Defendant is referring to the definition of extortion in the career offender guideline, USSG, which does not apply to her.  (See id.)

Seventh, in reference to Defendant's First Step Act credits, the Government asserts this argument is irrelevant because district courts are not the correct forum to adjudicate issues of First Step Act credits.  (See id. at 7.)  Instead, the Government argues that this issue should be "presented under 28 U.S.C. §2241 in the district of confinement, after exhaustion of administrative remedies."[6]  (Id.)

Finally, the Government responds to the other miscellaneous arguments as having been previously deemed insufficient by this Court to warrant compassionate release.  (See id.)  It reiterates that there exists no extraordinary and compelling reason "allowing consideration for compassionate release" and the §3553(a) factors favor requiring Defendant to serve her full sentence.  (Id.)

## III.   DISCUSSSION

### A.  The Analytical Framework Regarding Motions for Compassionate Release Pursuant to 18 U.S.C. §3582(c)

Generally, a district court "may not modify a term of imprisonment once it has been imposed . . . ."  18 U.S.C. §3582(c)(1)(A).  As amended by the recently enacted First Step Act,

---

[6]  28 U.S.C. §2241 (a) provides "Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts, and any circuit judge within their respective jurisdictions. . . ." The district with jurisdiction over writs of habeas corpus is the district where the prisoner is in custody.

§3582(c)(1)(A) empowers a district court to modify a term of imprisonment on a defendant's motion after the defendant has exhausted his administrative remedies.  See §3582(c)(1)(A)(i). The statute provides, in part, that a court:

> [M]ay reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in [§ 3553(a)] to the extent that they are applicable, if it finds that –
>
>> (i) extraordinary and compelling reasons warrant such a reduction; . . .
>
> and that such a reduction is consistent with applicable policy statements issues by the Sentencing Commission[.]

§ 3582(c)(1)(A).  Congress, however, has not defined the term "extraordinary and compelling reasons," except to the extent that "[r]ehabilitation of the defendant alone" is insufficient to constitute an extraordinary and compelling reason.  28 U.S.C. §994(t).  Instead, Congress delegated the authority to define "extraordinary and compelling reasons" to the United States Sentencing Commission.  This Commission has now updated the policy in Section 1B1.13 of the Sentencing Guidelines which provides that a sentence reduction under § 3582(c)(1)(A) may be ordered where a court determines:

> After considering the factors set forth in 18 U.S.C. § 3553(a), . . . that –
>
>> (1) (A) Extraordinary and compelling reasons warrant the reduction; . . .
>>
>> (2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and
>>
>> (3) the reduction is consistent with this policy statement

U.S.S.G. § 1B1.13(a).

Section 1B1.13 discusses the meaning of "extraordinary and compelling reasons," and lists specific qualifying circumstances: (1) a defendant's medical condition, (2) age, (3) family circumstances, and (4) abuse.  § 1B1.13(b).  Specifically, it states:

> Extraordinary and compelling reasons exist under any of the following circumstances or a combination thereof:

(1)  Medical Condition of the Defendant

(A)  The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory).  A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required.  Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-state organ disease, and advanced dementia.

(B)  The defendant is –

(i)      suffering from a serious physical or mental condition

(ii)     suffering from a serious functional or cognitive impairment, or

(iii)    experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or he is not expected to recover.

(C)  The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death

(D)  The defendant presents the following circumstances:

(i)      The defendant is housed at a correctional facility affected or at imminent risk of being affected by (1) an ongoing outbreak of infection disease, or (2) an ongoing public health emergency declared by the appropriate federal, state, or local authority;

(ii)     due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing

12

outbreak of infectious disease or the ongoing public health
emergency described in clause (i); and

(iii)   such risk cannot be adequately mitigated in a timely manner.

(2)  Age of the Defendant. The defendant (A) is at least 65 years old; (B) is
experiencing a serious deterioration in physical or mental health because of the
aging process; and (C) has served at least 10 years or 75 percent of his or her
term of imprisonment, whichever is less.

(3)  Family circumstances

(A) The death or incapacitation of the caregiver of the defendant's minor child or
the defendant's child who is 18 years of age or older and incapable of self-care
because of a mental or physical disability or a medical condition.

(B) The incapacitation of the defendant's spouse or registered partner when the
defendant would be the only available caregiver for the spouse or registered partner.

(C) The incapacitation of the defendant's parent when the defendant would be the
only available caregiver for the parent.

(D) The defendant establishes that circumstances similar to those listed in
paragraphs (3)(A) through (3)(C) exist involving any other immediate family
member or an individual whose relationship with the defendant is similar in kind to
that of an immediate family member, when the defendant would be the only
available caregiver for such family member or individual. For purposes of this
provision, "***immediate family member***" refers to any of the individuals listed in
paragraphs (3)(A) through (3)(C) as well as a grandchild, grandparent, or sibling of
the defendant.

(4)  Victim of Abuse. The defendant, while in custody serving the term of
imprisonment sought to be reduced, was a victim of:

(A) sexual abuse . . . ; or

(B) physical abuse resulting in "serious bodily injury". . . .

§ 1B1.13(b) (1)-(4).  Section 1B1.13 further provides a "catch-all" provision, which allows a court

to modify a sentence if "the defendant presents any other circumstance or combination of

circumstances that, when considered by themselves or together with any of the reasons described

in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4)." § 1B1.13(b)(5).

Furthermore, in general, "[i]n the context of the current global pandemic, [c]ourts around the country have [only] granted compassionate release where the defendant suffers from a serious condition that increases the likelihood of severe consequences from COVID-19." United States v. Somerville, 463 F. Supp. 3d 585, 596 (W.D. Pa. 2020) (internal quotation omitted) (quoting United States v. Brooks, No. 07-20047, 2020 U.S. Dist. LEXIS 85671, at *14 (C.D. Ill. May 15, 2020)). In the Third Circuit, this means that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release . . . ." United States v. Raia, 954 F. 3d 594, 597 (3d Cir 2020). In addition, "[m]ost, though not all, of the cases where compassionate release has been granted also involved some showing that COVID-19 is actually present, usually to a significant degree, in the facility where the prisoner is incarcerated." Somerville, 463 F. Supp. 3d at 596. Thus, "a prisoner seeking release due to COVID-19 must at least show: (1) a significantly serious medical condition, or advanced age, placing the prisoner at a uniquely high risk of grave illness or death if infected by COVID-19 in the facility where the prisoner is held." Id. at 596-597.

Finally, if a district court determines that an extraordinary and compelling reason exists, it must then weight that reason against the § 3553(a) factors to determine if a sentence reduction is warranted, and, if so, the extent of such reduction. See id. at 588 ("[T]he Court must weigh [the] extraordinary circumstances against the ordinary sentencing factors under 18 U.S.C. §3553(a)."). Section 3553(a) establishes factors for a court to consider in initially imposing a sentence. Not every factor is applicable, however, when considering a motion for compassionate release. In the instant case, the applicable factors are:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant;

(2) The need for the sentence imposed –

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public form further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

. . . [and]

(6)  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]

§ 3553(a)(1)-(2), (6).   Therefore, if a balance of a defendant's extraordinary and compelling reasons with the § 3553(a) factors support a reduced sentence, and that reduction is consistent with applicable policy statements of the Sentencing Commission, a court may reduce a defendant's prison term, modify the terms of the supervised release, or both.

**B.  Defendant's Motion for Compassionate Release Will Be Denied**

Defendant's Motion will be denied because she has not demonstrated an extraordinary and compelling reason for her release.  Furthermore, the relevant §3553(a) factors weigh against a reduction or modification of her sentence.[7]  Each of these conclusions is discussed seriatim.

---

[7] Because the Court will deny Defendant's Motion for the reasons given, it is not necessary to determine whether a reduction in her sentence is also consistent with applicable policy statements of the Sentencing Commission.

1.  **Defendant's Family Circumstances Do Not Present Extraordinary and Compelling Reasons for Her Release.**

Although the Court continues to sympathize with Defendant's family circumstances, Defendant still has not established an extraordinary and compelling reason to warrant compassionate release.  Defendant reasserts that she her eldest son needs a bone marrow transplant, her daughter requires genetic testing, and her youngest son passed away.  (Doc. No. 344 at 1; Doc. No. 351 at 6-7.)  As previously noted, "under. . . . § 1B1.13, the meaning of 'extraordinary and compelling' does not extend to Defendant's family circumstances because she has not demonstrated that her minor daughter or son's caregivers are unavailable because they either died or are incapacitated."  (Doc. No. 335 at 15.)  Defendant has not showed any further evidence that differentiates her claims from those in her previous motion.  As such, she remains unable to demonstrate that her family circumstances are so extraordinary and compelling to warrant compassionate release.[8]

2.  **Defendant's Medical Conditions Do Not Present Extraordinary and Compelling Reasons for Her Release**

As previously held, none of Defendant's medical conditions present an extraordinary and compelling reason for her release.  Defendant claims, again, that she suffers from a litany of medical conditions, yet these are not entirely confirmed by her medical records.  The records confirm Defendant suffers from adrenoleukodystrophy and is being treated for that condition as well as migraines, anxiety, depression, vitamin D deficiency, adjustment disorder with anxiety, and neuropathy.  Defendant claims she suffers from Multiple Sclerosis ("MS"), which is not confirmed

---

[8] This Court previously held "Defendant does not explicitly state or explain why her presence is uniquely required for her minor daughter and eldest son."  (Doc. No. 355 at 15.)  § 1B1.13 lists the death of the only caregiver of the defendant's child as an extraordinary and compelling reason.  Defendant is not the primary caregiver to any minor children as all of her children are adults.

by her medical records.  While it is true that health care providers have noted Defendant's complaints of potential MS, no official diagnosis has been made.  In this regard, Defendant was taken to a consultation with a neurologist on May 14, 2024.  The doctor wrote:

> Patient presents with 10 years of visual symptoms that is unlikely related to an underlying demyelinating process, although this is on the differential.  I will proceed with an MRI of the brain with attention to the optic nerves to evaluate for any demyelinating disease.  She will return upon completion of the MRI.

(Doc. No. 346 at 140.)  The specialist listed the need for the MRI as "routine."  (Id. at 141.) Subsequent visits to the BOP Health Services do indicate that Defendant was being "worked up for Multiple Sclerosis."  (See Doc. No. 346 at 1.)  However, MS was never specifically diagnosed by any health service and instead is only a potential condition suffered by Defendant.  (See Doc No. 322-1 at 97 (2022 MRI report listing MS as a possible explanation)); See U.S. v. Batista, No. 18-415, 2020 WL 4500044, at *2 (D. N.J. Aug. 5, 2020) (finding prisoner's claim of having multiple sclerosis is not supported when no "final diagnosis" has been made).  Even if Defendant provided a final diagnosis of MS, release based on the condition requires severe complications or a danger that may constitute an extraordinary or compelling reason.  See, e.g. United States v. Curtis, No. 03-533, 2020 WL 1935543, at *2, *4 (D.D.C. April 22, 2020) (concluding defendant with MS who lost 85% of his vision, is unable to walk, is intermittently incontinent, and "requires assistance with all activities of daily living" has shown a compelling reason for release); but see United States v. Timm, 10-747, 2024 WL 3371345, at *3 (D. N.J. Jul. 11, 2024) (finding prisoner with MS, who has lost vision in one eye and is taking immunosuppressant medication, did not show an extraordinary and compelling reason to warrant compassionate release).

Here, even if this Court were to assume Defendant has Multiple Sclerosis, she has not shown that it constitutes an extraordinary and compelling reason.  First, Defendant has not completely lost vision in either eye, though she complains of "vision changes."  (See Doc. No. 346

at 1.)  Second, Defendant is still able to walk, albeit "walking slowly" and while "appearing fragile."  (See Doc. No. 346 at 1.)  Finally, Defendant is not confined to her bed and remains able to perform "self-care" in the facility.[9]

Defendant also argues that her medical care is insufficient while incarcerated, focusing on delays in treatment and the requirements to go to a pill line daily to get medication.  (See Doc. No. 344 at 7.)  However, as this Court has previously noted, the BOP has both taken measures to resolve Defendant's medical conditions and has the intention to continue treating Defendant.  This remains true as BOP Health Services has continued to meet with Defendant and has worked to address her medical concerns.[10]

Defendant again argues that her prison has not adopted appropriate measures to protect inmates from the spread of COVID-19.  Defendant has provided no evidence of a risk of exposure to COVID-19 while in FCI Danbury.[11]  The Third Circuit has recognized "[g]iven vaccine availability, a prisoner likely will not be able to prove that his personal risk of serious illness from

---

[9]  The BOP will consider compassionate release if a prisoner is "[c]ompletely disabled, meaning the [prisoner] cannot carry on any self-care and is totally confined to a bed or chair; or [c]apable of only limited self-care and is confined to a bed or chair more than 50% of waking hours." Fed. Bureau of Prisons, Program Statement 5050.50:  Compassionate Release/Reduction Sentence: Procedures for Implementation of 18 U.S. C. 3582 AND 4205(G), at 5 (Jan. 17, 2019.)  https://www.bop.gov/policy/progstat/5050_050_EN.pdf.

[10]  In addition, her claim of inadequate medical treatment as a reason for compassionate release should be addressed through the BOP's established administrative process.  In United States v. Williams, the court held that "if adequate medical care is an issue, [Defendant] can pursue available administrative means to address his issues."  United States v. Williams, No. 18-132, 2021 WL 2400860, at *4 (W.D. Wash. June 11, 2021).

[11]  The BOP's latest COVID-19 data shows a single recent case in FCI Danbury as of November 6, 2024.  See Inmate COVID-19 Data FEDERAL BUREAU OF PRISONS https://www.bop.gov/about/statistics/statistics_inmate_covid19.jsp (last accessed Nov. 6, 2024).

COVID-19 is an extraordinary and compelling reason for release unless [they] can convincingly show that [they are] 'unable to <u>receive or benefit from</u> a vaccine' or that he 'remain[s] vulnerable to severe infection, notwithstanding the vaccine.'" <u>United States v. Estevez-Ulloa</u>, Crim. No. 21-2432, 2022 WL 1165771, at *2 (3d Cir. Apr. 20, 2022) (citing <u>United States v. Rucker</u>, 27 F.4th 560, 563 (7th Cir. 2022)) (emphasis added).  Defendant has not shown that she suffers from sufficiently serious medical conditions that place her at a uniquely high risk of illness or death if she were to contract COVID-19.  Further, Defendant continues to refuse to get the COVID-19 vaccination, even after being offered the vaccine at least three times.  (Doc. No. 346 at 71; Doc. No. 351 at 4); <u>see also</u> <u>United States v. Reed</u>, Crim. No. 18-78, 2021 WL 2681498, at *4 (E.D. Pa. June 30, 2021) (the threat of COVID-19 alone does not warrant compassionate release once a vaccine is <u>made available</u> to the inmate (emphasis added)).  Accordingly, Defendant has not demonstrated any extraordinary or compelling reason regarding her medical condition to warrant granting her Third Motion for Compassionate Release.

### 3. Defendant's Claim of Abuse Lacks Sufficient Evidence to Establish an Extraordinary or Compelling Reason.

Defendant again claims that she was abused at another institution by a BOP staff member. (Doc. No. 344 at 9.)  While she filed a complaint with the BOP, Defendant has not provided any evidence that the alleged misconduct was established by "conviction in a criminal case, a finding or admission of liability in a civil case, or a finding in an administrative proceeding . . . ."  (<u>See</u> Doc. No. 344 at 84-88.)  Further, Defendant has not proven an undue delay or that she is in imminent danger.[12]  As such, Defendant's claim of abuse lacks sufficient evidence to establish an extraordinary or compelling reason for modification of her sentence.

---

[12] Defendant's alleged abuser was located in FPC Alderson.  She is now located in FCI Danbury. (<u>See</u> Doc. No. 344 at 84.)

#### 4.   Defendant's FSA Credit Calculation Does Not Warrant Her Release

Defendant avers that her First Step Act Credits have accumulated to a level such that she is eligible to be immediately released into a half-way home.  (See Doc. No. 344 at 13-14.)  This is not the forum to adjudicate the calculation of Defendant's sentence.  Instead, a challenge should be brought under 28 U.S.C. § 2241 in the district of confinement, after exhaustion of administrative remedies.  See, e.g., United States v. Kaneko, No. 19-00062, 2024 WL 1018362, at *4 (D. Haw. Mar. 8, 2024) ("[A] motion for compassionate release . . . is the wrong vehicle to address a purported denial of FSA time credits."); see also Woodall v. Federal Bureau of Prisons, 432 F. 3d 235, 241 (3d Cir. 2005) (holding that Federal prisoners may challenge some aspect of the execution of their sentence under § 2241).  The United States Bureau of Prisons has the responsibility to calculate First Step Act Credits.  See 18 U.S.C.A. § 3632(d)(4).  If Defendant is dissatisfied with the calculation, she may challenge it by filing administrative appeals within the Bureau of Prisons.

#### 5.   There Has Been No Change in Law Warranting Defendant's Release

Defendant argues that Hobbs Act Extortion has been amended and no longer applies to her. (See Doc. No. 344 at 4.)  First, she asserts that the Hobbs Act Extortion charge definition "was clarified to mean violence of physical or personal property."  (Doc. No. 344 at 14.)  Defendant appears to be referring to the 2016 Amendment to the Sentencing Guidelines (Amendment 798), which changed the definition of "extortion" as a "crime of violence" in the career offender guideline.[13]   USSG § 4B1.2(e)(2).  However, that guideline did not apply to her at sentencing because she was not a career offender, and neither did any other provision relating to a crime of violence.  See Presentencing Report at 23.

---

[13] See §4B1.2(e)(2).  EXTORTION.—"**Extortion**" is obtaining something of value from another by the wrongful use of (A) force, (B) fear of physical injury, or (C) threat of physical injury.

Alternatively, Defendant avers that Amendment 821 of the Sentencing Guidelines should reduce her sentence because the Criminal History Category in Chapter Four, Part B, Subpart One (Zero Point Offenders) was amended for offenders with a zero-point criminal history. Specifically, the Amendment "provides a decrease of two levels from the offense level determined under Chapters Two and Three for offenders who did not receive any criminal history points under Chapter Four, Part A and whose instant offense did not involve specified aggravating factors." USSG App. C, Part B, Subpart 1- Adjustment for Certain Zero-Point Offenders. Now, § 4C1.1(a) provides:

(a) ADJUSTMENT.—If the defendant meets all of the following criteria:

(1) the defendant did not receive any criminal history points from Chapter Four, Part A;

(2) the defendant did not receive an adjustment under §3A1.4 (Terrorism);

(3) the defendant did not use violence or credible threats of violence in connection with the offense;

(4) the offense did not result in death or serious bodily injury;

(5) the instant offense of conviction is not a sex offense;

(6) the defendant did not personally cause substantial financial hardship;

(7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

(8) the instant offense of conviction is not covered by §2H1.1 (Offenses Involving Individual Rights);

(9) the defendant did not receive an adjustment under §3A1.1 (Hate Crime Motivation or Vulnerable Victim) or §3A1.5 (Serious Human Rights Offense); and

(10) the defendant did not receive an adjustment under §3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848;

decrease the offense level determined under Chapters Two and Three by **2** levels.  USSG

§ 4C1.1(a).

    (b) DEFINITIONS AND ADDITIONAL CONSIDERATIONS. —

        (3) In determining whether the defendant's acts or omissions resulted in "<u>substantial financial hardship</u>" to a victim, the court shall consider, among other things, the non-exhaustive list of factors provided in Application Note 4(F) of the Commentary to §2B1.1 (Theft, Property, Destruction, and Fraud).

U.S.S.G. § 4C1.1(a), (b)(3).

Defendant is correct that she received no points in her Criminal History Category.  <u>See</u> Presentencing Report at 23.  However, under § 4C1.1(a)(6), in noting whether the defendant caused substantial financial hardship as an exception, the Court is required to consider the following factors:

        (F) **Substantial Financial Hardship.—** In determining whether the offense resulted in substantial financial hardship to a victim, the court shall consider, among other factors, whether the offense resulted in the victim—

        (i) becoming insolvent;

        (ii) filing for bankruptcy under the Bankruptcy Code (title 11, United States Code);

        (iii) suffering substantial loss of a retirement, education, or other savings or investment fund;

        (iv) making substantial changes to his or her employment, such as postponing his or her retirement plans;

        (v) making substantial changes to his or her living arrangements, such as relocating to a less expensive home; and

        (vi) suffering substantial harm to his or her ability to obtain credit.

U.S.S.G. § 2B1.1(2) cmt. n.4 (F).   The factors are non-exhaustive.  See id.  As noted by the Third

Circuit, determining substantial financial hardship is measured "on a sliding scale that is also fairly

subjective."  United States v. Poulson, 871 F.3d 261, 268 (3d Cir. 2017).

> [B]etween a minimal loss or hardship (occurring, perhaps, when a defendant
> fraudulently obtains five dollars a victim had intended to donate to charity), and a
> devastating loss (occurring in the wake of a scheme to wipe out of a victim's life
> savings), there lies a wide range in which we rely upon the judgment of the district
> courts, guided by the non-exhaustive list of factors in Application Note 4[ (F) ]. In
> the end, this is just one more determination of a fact that bears on the ultimate
> sentence; that determination is entitled to the normal deference that applies to all
> facts found at sentencing.

Id. (quoting United States v. Minhas, 850 F.3d 873, 878 (7th Cir. 2017)).

Here, Defendant, an employee of the Internal Revenue Service ("IRS"), and her husband

enlisted claimants who would give them personal identifying information (PII), and used their PII

to file "false, fictitious, and fraudulent tax returns."  (Doc. No. 293 at 1.)  Using "her knowledge

of various tax credits and IRL internal auditing standards," Defendant expected the IRS to process

and honor the fraudulent tax returns.  (Id. at 1-2.)  After the returns were processed and honored,

Defendant would keep a portion of the refunds and give the remainder to the enlisted claimants.

(Id. at 2.)  In addition to submitting "false, fictitious, and fraudulent tax returns," Defendant also

extorted claimants who "did not pay her a portion of the tax refund."  (Id.)  She would threaten to

"red flag" with the IRS those who refused to pay.  (Id.)  Defendant would then fulfill these threats

by "forg[ing] the claimant's signature on an additional false filing to the IRS to 'reverse' the refund

that the IRS had already issued."  (Id.)

Defendant was ultimately convicted of conspiracy to defraud the United States, filing false

IRS claims and tax returns, and Hobbs Act extortion in the amount of $2,238,552.40.  Defendant

was personally found to have filed false tax returns for at least 35 claimants.  See Presentencing

Report at 10-11.  Thus, Defendant's scheme caused substantial financial hardship.  These facts demonstrate that Amendment 821 does not apply to Defendant and thus she is ineligible for a sentence reduction.

## C.  The § 3553(a) Sentencing Factors Weigh Against Defendant's Release

Lastly, the relevant § 3553(a) factors continue to undermine Defendant's Motion for Compassionate Release.  First, the Court has examined the nature and circumstances of the offense and Defendant's history and characteristics.  See 18 U.S.C. § 3553(a)(1).  Although Defendant continues to assert that she is a "non-violent, first-time white-collar offender," the offenses that led to her incarceration are serious crimes.  (Doc. No. 319 at 2.)  Defendant used her employment with the IRS and her knowledge of tax credits and the IRS' system to defraud the United States government of over $2.2 million.  (See Doc. No. 293 at 1-2.)  Considering these facts, the Court remains unconvinced that Defendant would be deterred from committing additional crimes if released.

This Court again considered whether Defendant's release would reflect the seriousness of her offenses, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public from further crimes by her.  See 18 U.S.C. §3553(a)(2)(A)-(C).  Although Defendant has served over 60% of her sentence, her crimes warrant the sentence she received.[14]

---

[14] In United States v. Pawlowski, 967 F.3d 327 (3d Cir. 2020), the Third Circuit held the following regarding 18 U.S.C. § 3582(c)(1)(A) and its requirement that a court reviewing a motion for compassionate release consider the § 3553(a) factors to the extent they are applicable:

> Because a defendant's sentence reflects the sentencing judge's view of the § 3553(a) factors at the time of the sentencing, the time remaining in that sentence may – along with the circumstances underlying the motion for compassionate release and the need to avoid unwarranted disparities among similarly situated inmates – inform whether immediate release would be consistent with those factors.

And despite Defendant's contention that she has a low chance of recidivism and has aged out of crime, it remains appropriate upon consideration of the 18 U.S.C. § 3553(a) factors for her to serve her full sentence.  (Doc. No. 344 at 14.)  Moreover, it is still evident that Defendant's release at this point would not reflect the seriousness of her offenses, promote respect for the law, provide just punishment, afford adequate deterrence, nor protect the public from further crimes she may commit.

Finally, the Court has considered the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.  See 18 U.S.C. § 3553(a)(6).  On this factor, Defendant argues that her sentence was significantly larger than that of similarly situated defendants.  (See Doc. No. 344 at 10).  Defendant received a sentence within the range set by the Sentencing Guidelines, which Congress created to specifically address sentencing disparities.  Defendant also argues that her Motion should be granted because of the death of her sentencing judge, Judge Dalzell, and the fact that COVID-19 has made her sentence "harsher than Congress, the Sentencing Commission, and [Judge Dalzell] intended."  (See Doc. No. 344 at 1.)  However, to reduce Defendant's sentence would actually frustrate the Sentencing Commission's goal of avoiding unwarranted sentence disparities among similarly situated defendants and ensuring consistent punishment for similar offenses.[15]  Therefore, none of the applicable § 3553(a) factors favor Defendant's release.

---

Id. at 331.

[15] For a third time, Defendant attempts to relitigate the length of her sentence.  Defendant may not use a compassionate release motion to relitigate the length of her sentence and instead must raise this claim in a §2255 motion.

**IV.**   **CONCLUSION**

For the foregoing reasons, Defendant's Third Motion for Compassionate Release Pursuant to 18 U.S.C. §3582(c)(1)(A)(i) (Doc. No. 344) will be denied.  An appropriate Order follows.